## Mazaika *v.* Krauczunas, Appellant.

*Church law—Property rights—Roman Catholic Church—Equity—Act of April 26, 1855, P. L. 328—Bishop—Lay members.*

1. A court of equity will not enforce a resolution passed at a meeting of a Roman Catholic congregation vesting in the bishop of the diocese as such all the property of the congregation to hold all such property as trustee in accordance with the laws, rules and usages of the Roman Catholic Church, where the evidence shows that under the laws of the church the bishop is invested with the absolute control of the church property. To enforce such a resolution would be to violate the express terms of the Act of April 26, 1855, sec. 7, P. L. 328, which provides that church property "shall not be otherwise taken and held, or enure, than subject to the control and disposition of the lay members of such church."

2. Under the Act of April 26, 1855, P. L. 328, when property has been bequeathed, devised or conveyed to any person or persons whomsoever for the use of any church, congregation or religious society for religious worship the person so acquiring the legal title is as to the property acquired but a dry trustee without any power of control or management.

Argued Feb. 23, 1911. Appeal, No. 361, Jan. T., 1910, by defendants, from decree of C. P. Lackawanna Co., Nov. T., 1908, No. 1, on bill in equity in case of Alex. Mazaika et al. v. Andrew Krauczunas et al. Before MESTREZAT, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Reversed.

Bill in equity to obtain a conveyance of property and for an injunction.

NEWCOMB, J., found the facts to be as follows:

1. The property in question consists of three contiguous lots at the northwesterly intersection of North Main avenue and Theodore street, in this city, designated as eleven, twelve and thirteen according to a map or plot of lots known as "Electric City Park," which is recorded in the proper office of this county. They are the same lots conveyed by Bishop Hoban to the defendants, as trustees, etc., by deed dated May 29, 1908, and are particularly described in the fourth paragraph of the bill. They are improved with a church edifice, built in 1893.

2. As so improved the property has from that time ever since been in the actual use and enjoyment of St. Joseph's Lithuanian Catholic Congregation of Scranton—except as hereinafter stated—as a place of religious worship in accordance with the purposes of its organization.

3. The congregation was organized about 1891 or 1892 as an unincorporated religious association for the support of public worship according to the laws, usages, faith, doctrine and discipline of the Catholic church. For that purpose the property was acquired and paid for with funds furnished and contributed by the members. It is not disputed that the beneficial ownership is in the congregation and that at all times since the purchase the legal title has been held by some person or persons in trust for its uses as such congregation.

4. The congregation has at all times been subject to the ecclesiastical jurisdiction of the Catholic bishop of the diocese of Scranton, and under the pastoral charge of a priest appointed to it by him, although during the pendency of this suit the use of the property for church purposes has been prohibited by Rt. Rev. Michael J. Hoban, who has been bishop of the diocese since 1899.

5. The trustees who have held the legal title have at all times been certain of the lay members of the congregation. In late years it has been held by the ten defendants.

That was objectionable to the bishop as contrary to the prevailing rule of the church on the subject, and eventually brought on a factional controversy between the members. Litigation began in 1906 over a conveyance of the title which had that year been made to the bishop in pursuance of certain action had at a meeting of the congregation. The validity of the transfer was successfully attacked by the faction supporting the ten lay trustees. The nature of that controversy appears by reference to the proceedings therein which have been put in evidence, and its result by official report of the case in 221 Pa., at page 213. It terminated in the reconveyance by the bishop to the defendants mentioned in the first conclusion, supra.

6. The outcome of that transfer was the congregational meeting of June 8, 1908,—an attempt, no doubt, by the faction supporting the bishop to have the title put in his name in conformity with the statute governing the selection of an ecclesiastical trustee in such cases.

7. This meeting was called by the pastor for St. Mary's hall, and announced from the altar at the last service held in the church, to wit, May 31, 1908, in connection with the reading of the bishop's interdict discontinuing the use of the church, which became effective at that date.

8. In the first instance the meeting was called for Sunday evening, June 7. Upon reflection the priest deemed it advisable to have it on a secular date and so changed it to the eighth. Of this change he caused notice to be given, (1) by advertisement during the week in several daily newspapers of general circulation published in this city, and (2) by handbills in the Lithuanian language generally distributed among the members of the congregation and posted in their business places. At the time of the interdict the religious services of the congregation were by authority of the bishop transferred to the chapel of St. Thomas college in this city where they have been held ever since. At the first service held there, viz., Sunday, June 7, the change of date for the congregational meeting was again announced by the priest. In addition to that, the

defendants and a committee of the faction adhering to them issued handbills in effect joining in the call for the St. Mary's hall meeting of June 8. These were circulated during the week by the defendants in the same way as those issued by authority of the priest.

9. An attempt is made to charge the priest with changing the place as well as the date of meeting. The fact is that the notices in two of the newspapers specified the time and place as follows: "In St. Mary's hall, West Market street, on the 8th day of June, at 7 o'clock P. M., instead of the 7th as heretofore announced," etc.; while in the third paper it read, "instead of Sunday the 7th and in the Auditorium as heretofore announced," etc. This on its face implies an earlier notice of the meeting at the Auditorium. But it was the error of some person who prepared the notice for the printer. There had been no such announcement, and the priest was not aware of the error until long after the meeting had been held. It is not shown that anyone ever understood the meeting to have been called for any place other than St. Mary's hall. The action of the defendants and those adhering to them precludes the inference of any misunderstanding in the premises on their part.

10. By the law of the church and the regulations in force in this diocese it is required, (1) that congregational meetings shall be called by the pastor and due notice given from the pulpit; and (2) that the right to vote at such meetings shall be restricted to those who are practical Catholics and have contributed regularly to the support of the congregation by the payment either of pew rent, a seat in its church, or annual dues.

11. In this congregation the male members of full age have from the start been accustomed to pay as annual dues the sum of $6.00, very generally in monthly installments of fifty cents. These payments were noted by the secretary in a dues book specially printed in their language for that purpose. Previous to 1906 the congregation had been in harmony and the accounts seem to have

been kept by a secretary who turned the books over to the defendant trustees after the litigation started. To what extent payments since then have been made to the committee recognized by the trustees, as distinguished from that recognized by the priest, does not appear.

12. But to avoid controversy on that ground it was mutually agreed by the factions and announced by authority of the pastor that all male members of full age who had paid dues as late as 1905, the last year when the congregation was harmonious, should be allowed to vote at the meeting without regard to payments since the dissension began. To that end it was mutually agreed and fully understood that the members should be prepared to show their dues books at the hall.

13. The hall was opened at seven o'clock in the evening of the day appointed and between that hour and eight o'clock the congregation assembled. A committee composed of members of both factions was stationed at the door to see that only those were admitted who were entitled to vote.

14. As to what took place from that time until the meeting closed at eleven o'clock there is a marked conflict in the testimony. On the weight of the credible evidence it is found: (1) That all male members of voting age were admitted who showed by their due books or otherwise that they had paid as late as 1905; (2) that by eight o'clock all qualified members who so desired had been admitted; (3) at that hour the meeting was called to order by the pastor and was duly organized by the election of a chairman and secretary; (4) its object was stated as well by the chairman as by the priest, namely, to take action on the question of substituting the bishop as trustee in place of the defendants; (5) this was followed by prolonged discussion, pro and con, freely participated in by both factions, the speakers addressing the audience from the platform; (6) eventually the question was submitted in the form of a resolution in writing after its terms had been explained at length; (7) in substance and practical

effect it was a proposal that the bishop be chosen as trustee to hold the title to all the property of the congregation in accordance with the laws, rules and usages of the Catholic church in this diocese.

15. By direction of the chairman the vote was taken by a "division of the house." Those who favored the proposed change accordingly moved to one side of the hall and those opposed took their station on the other side. Of the 1,000 or more members thus voting an overwhelming majority voted in the affirmative. Exact figures cannot be had; but evidently not more than 100 voted in the negative; and it is so found.

16. The result was announced by the chairman accordingly, and the meeting closed after the appointment of the plaintiffs as a committee to attend to the details of procuring a transfer of the legal title from the defendants, with authority to take such proceedings at law or in equity as might be necessary "to secure the conveyance from the trustees above mentioned to the Rt. Rev. Michael J. Hoban, Bishop of Scranton, trustee," for the congregation.

17. In this way, as between the defendants and the bishop, a majority of the voting membership expressed its choice for trustee. But on demand being made the transfer was refused by defendants and that brought on the present suit.

The court entered the following decree:

And now, November 19, 1910, this cause came on to be heard at a regular term of equity court, and was argued by counsel, and upon consideration thereof, it is ordered, adjudged and decreed that the defendants shall within seven days from the date hereof, execute, acknowledge and deliver a proper deed of the premises described in plaintiffs' bill, held by said defendants in trust for St. Joseph's Lithuanian Catholic Congregation of the city of Scranton, to Rt. Rev. Michael J. Hoban, Bishop of Scranton, as trustee for St. Joseph's Lithuanian Catholic Congregation of the city of Scranton.

It is further ordered that the defendants pay the costs

other than those which plaintiffs were directed to pay by order of the Supreme Court on setting aside the former decree of January 7, 1910.

*Error assigned* was the decree of the court.

*William Jessup Hand*, for appellants.

*John G. Johnson*, with him *T. P. Hoban* and *John P. Kelly*, for appellees.

OPINION BY MR. JUSTICE STEWART, October 9, 1911:

Either the deliverances of this court as reported in 221 Pa. 213, and 229 Pa. 47, with respect to the ownership of church property and congregational power in connection therewith, have been seriously misapprehended, or the present proceeding is a clear attempt to circumvent the law as we have there declared it. In the first of the cases referred to, Krauczunas v. Hoban, the effort was on the part of the ten lay members of the congregation, duly chosen trustees of the legal title to the church property, to compel a reconveyance to them of the title by Bishop Hoban who had previously been designated trustee of the title for a special purpose which had been fully accomplished. The effort of these trustees was resisted, not on the ground that the congregation was without statutory right to choose its own trustee or trustees for the purpose indicated, or that the election of these particular trustees was in any way irregular, but distinctly on the ground that any such election, except as it resulted in the choice of the bishop of the diocese in which the property was located, offended against the rules and regulations of the Catholic church. To make this clear it is only necessary to quote a single finding of fact, and the conclusion derived therefrom, on which the lower court rested its dismissal of the plaintiffs' bill. The finding was as follows: "The Canons of the Roman Catholic Church provide and require that the title to the property of the Roman Catholic Congre-

gation which is under the jurisdiction of the Roman Catholic Bishop of the Diocese in which the Congregation has its place of worship, must be in the ordinary, or, in the present case, in the Bishop of the Diocese." This was the conclusion derived: "If a congregation is formed for the purpose of religious worship according to the faith and rites of the Catholic church, and has accepted the pastor assigned to it by the bishop of the diocese, has placed itself under the authority of the bishop and submitted itself to his authority in all ecclesiastical matters, the title to its property must be taken and held as provided by the Canons of the Catholic Church. The property acquired by the congregation under such circumstances is the property of the church, and is subject to its control and must be held in the manner directed by its laws. . . . The title to the real estate described in plaintiffs' bill is properly and legally vested in the defendant, Rt. Rev. Michael J. Hoban, Bishop of Scranton, as trustee for St. Joseph's Lithuanian Catholic Congregation, in accordance with the laws and usages of the Catholic Church." Referring to this language, in our review of the case, we said: "It will be seen from this that what was a controversy over an unimportant result—the right to substitute one dry, passive trustee of a legal title for another—was made to involve a question of ownership of property. . . . Conveyance to the Church is not pretended; nor is forfeiture on the part of the congregation. Nothing is asserted in this connection but ecclesiastical rules and regulations, which, except as they are aided by legal conveyance, are ineffectual to divest any owner of his property. But more than this the position taken by the defendant and sustained by the court, is in direct opposition to the law, whose supremacy, over all ecclesiastical rules and regulations, when rights of property are concerned, is not to be questioned. The Act of April 26, 1855, P. L. 328, sec. 7, provides that 'whensoever any property, real or personal, shall hereafter be bequeathed, devised or conveyed to any ecclesiastical corporation, bishop, eccle-

siastic, or other person, for the use of any church, congregation, or religious society, for religious worship or sepulture, or the maintenance of either, the same shall not be otherwise taken and held, or enure, than subject to the control and disposition of the lay members of such church, congregation, or religious society, or such constituted officers or representatives thereof, etc.'' '' We accordingly sustained the appeal, and ordered that Bishop Hoban reconvey the church property to the plaintiffs as trustees. It is to be remarked in this connection that these trustees, because of their attempt to vindicate their right under the law, had been excommunicated by the bishop (Appendix, p. 233). Nevertheless the bishop complied with the decree of the court, and made conveyance of the title; he followed it up, however, with an episcopal interdict which closed the doors of the church against the congregation. This interdict reads as follows: ''The members of St. Joseph's Congregation; Greeting—The court has decided that the Catholic Bishop of Scranton must hand over to a band of excommunicated apostates the deed of the Catholic Church of St. Joseph's. As the church cannot be used for any other worship than Catholic Worship, and as it is intolerable to hold Catholic services in a church controlled by members who despise the Church and Her laws, and who have lost their Catholic Faith, I am exceedingly pained to be obliged to place the Lithuanian Catholic Church of St. Joseph's under interdict until the members of the congregation shall turn these faithless men out and place the Church once more under the care of the Bishop of the Diocese of Scranton, according to the laws of the Catholic Church. I now declare that the Lithuanian Catholic Church of St. Joseph's, North Main Avenue, in this city of Scranton, is hereby placed under Interdiction from midnight of Sunday, May 31–June 1, 1908, and that no Catholic services of any kind shall be held therein, nor shall any Catholic enter therein without incurring ecclesiastical censure, until the Interdict shall be removed.'' (signed) ''Michael John Hoban, Bishop

of Scranton." Simultaneously with the proclamation of this edict a meeting of the congregation was called, elsewhere than in the church, to determine how the title to the property was to be held. We are not now concerned with the factional differences which disturbed that meeting, and resulted in a separate meeting of the dissentients, except to say that the latter repudiated the action attempted at the meeting regularly called, and declined to reconvey the title to the bishop. The present bill was filed to enforce compliance. A protracted hearing resulted, the one issue being the regularity in the proceedings and membership of the meeting which declared for a reconveyance to the bishop. In the course of two or three days— we use the language of the chancellor before whom the case was heard—it became apparent that if the question were to be decided by review of the action taken at that meeting, the result would be unsatisfactory or doubtful. It was consented to by the individual litigants that an election should be held in open court, conducted by the chancellor. Such election was held, covering several days, and resulted, according to the findings of the chancellor, in the election of Bishop Hoban as trustee. A decree followed requiring a reconveyance of the title to him. On appeal to this court, Mazaika v. Krauczunas, 229 Pa. 47, we held that the election before the chancellor in open court was without effect for reasons therein stated at length, and which need not be repeated here, and we accordingly set aside the decree and remitted the record, the case to be proceeded with as though the election in court had not been held. The case was thereupon proceeded with in due form, with like conclusions upon the issues raised by the original bill and answer, and we have this present appeal from a decree requiring a reconveyance to the "Rt. Rev. Michael J. Hoban, Bishop of Scranton, as trustee for St. Joseph's Lithuanian Catholic Congregation of the city of Scranton." If the case rested simply on the findings of fact and conclusions of the learned chancellor with respect to the regularity of the proceedings in

the meeting of the congregation at which Bishop Hoban was declared to have received a majority of the votes cast, while much that there occurred is open to criticism, we would not feel justified in prolonging this unprofitable controversy by a reversal. But there are other admitted facts which have a significance not to be overlooked. In this we make no reference to the excommunication of the appellants as a punishment for their appeal to the law of the land for a vindication of the right of the congregation they represented to the control of its property, nor to the episcopal edict which followed at once upon our decision, depriving the congregation of the privilege of Christian worship according to its faith and practice in its own sanctuary until such time as it chose to elect the bishop of the diocese the trustee of the legal title to its property. We will assume that these acts were within episcopal authority under the polity of the Roman Catholic Church, however much they may be at variance with the policy of our civil law which regards with condemnation all interference with freedom of elections. No one is heard complaining in regard to them, and they concern us here only as they help to an understanding of the real purpose of the meeting of the congregation whose action in the election of Bishop Hoban as trustee has been sustained by the court below. The resolution embodying the action of the meeting was as follows: "Whereas, it is deemed advisable and proper, and it is also the desire of the members of St. Joseph's Lithuanian Catholic Congregation of the city of Scranton, Pennsylvania, to vest the title to all the property of said St. Joseph's Lithuanian Catholic Congregation of the city of Scranton, Pennsylvania, in Rt. Rev. Michael J. Hoban, Bishop of Scranton, as trustee for said St. Joseph's Lithuanian Catholic Congregation, in accordance with the laws, rules and usages of the Catholic Church in the diocese of Scranton and state of Pennsylvania.

"Now, therefore be it resolved, That all the property of said St. Joseph's Lithuanian Catholic Congregation is, and is hereby declared, subject to the jurisdiction of the

Catholic Church and the Catholic Bishop of Scranton, and be it further

"Resolved that Rt. Rev. Michael J. Hoban, Bishop of Scranton, be, and is hereby chosen and designated trustee for said St. Joseph's Lithuanian Catholic Congregation of the city of Scranton, Pennsylvania, to hold as such trustee all the property of said Congregation, and the title thereto in accordance with the laws, rules and usages of the Catholic Church in the Diocese of Scranton and state of Pennsylvania." The significance of the language here employed can be fully understood only as we recall what was said by this court in Krauczunas v. Hoban, supra, the language of the interdict of the bishop closely following upon our decision, and the rules and regulations of the Catholic church with respect to the property of the congregation as defined by Bishop Hoban in his testimony in the case. In the case referred to we distinctly held that the case was one involving the right of property, and that the law governing was not to be found in the rules and regulations of the general ecclesiastical system, but in the statute of April 26, 1855, P. L. 328, wherein it is declared that property "devised or conveyed to any ecclesiastical corporation, bishop, ecclesiastic or other person, for the uses of any church, congregation, or religious society for religious worship, or sepulture, or the maintenance of either, the same shall not be otherwise taken and held, or enure, than subject to the control and disposition of the lay members of such church, congregation or religious society, or such constituted officers or representatives thereof." The contention of the bishop there was that he had a right to hold the title to the property under the Catholic system, virtute officii. This view having prevailed with the court below we sustained the appeal, and expressly held that the position taken "is in direct opposition to the law whose supremacy over all ecclesiastical rules and regulations, when the rights of property are concerned, is not to be questioned." We further held that the conveyance to the appellees in that case constituted an

executed legal estate in the congregation, and created a dry, passive trust which gave the trustees neither interest in the estate, nor power to control it or direct its management in any way; that trustees in such case become simply the depository of the legal title and nothing more. We refer in this connection to only so much of the interdict as decreed that it shall continue in force "until the members of the Congregation shall turn out these faithless men [the acting trustees] and place the Church once more under the care of the Bishop of the Diocese of Scranton according to the laws of the Catholic Church." We make no question here of the authority of the bishop under the rules of the church for this coercive decree. It was nevertheless a manifest attempt to deny to the congregation freedom of action with respect to property of which, under the law of the land, it was sole owner; notwithstanding, the bishop, as he himself asserts, was acting strictly in line with his episcopal duty and prerogative. He had testified that as bishop of the diocese he had control and disposition of the church property under the general laws of the church. He was asked "Whether under the ecclesiastical law of the Catholic Church the lay members had the right of control and disposition of the property, or whether the bishop had the right?" His answer was as follows: "Under the general law of the church the lay people have not the right to control." He was again asked, "Under the law of the church, the ecclesiastical law, have the members of the church the right to hold the property as trustee for the congregation?" His answer was, "No, they have not." In this reflected light we may see the real significance of the language used in the resolution declaring for the election of Rt. Rev. Bishop Hoban, "to hold as trustee all the property of said Congregation and the title thereto in accordance with the laws, rules and usages of the Catholic Church in the Diocese of Scranton;" that is to say, even to a denial to the congregation of the chief incident of its ownership, control of the property which is its own under the laws of the state

of Pennsylvania. In the case above cited we took occasion to explain, in the hope that it would end this prolonged controversy, that a trust in such cases gives to the trustee neither interest in the estate, nor power to control it or direct its management in any way; that it creates no duty for the trustee to perform, and leaves nothing to his discretion; that he is simply the passive, silent depository of the legal title and nothing more. In view of the plain words of the statute thus called to their attention as to the exclusive right of property in the congregation, the unquestioned sovereignty of the law where rights of property are involved, the legal inhibition against the bishop, qua bishop, exercising control of the church property, the positive conflict in this respect between the rules and regulations of the Catholic church and the statute laws of the state, what other conclusion can be reached than that the action of the meeting of the congregation, as expressed in the resolution we have referred to, and at which it is claimed Bishop Hoban was elected trustee, was a clear attempt to invest that particular ecclesiastic with an authority over the congregational property which the law expressly forbids? If no other purpose was intended than to elect Michael J. Hoban, in his private and natural capacity—the only capacity in which under the law he was competent to hold the legal title as trustee—was it for the purpose of identification that he was described as "Rt. Rev. Michael J. Hoban, Bishop of the Diocese of Scranton?" We should likely so conclude, were this all; but this is preceded by the express declaration that all the property of this congregation is to be subject to the jurisdiction of the Catholic church and the Catholic Bishop of Scranton, and followed by the equally express declaration that the bishop is to hold as such trustee all the property of said congregation, and the title thereto, in accordance with the laws, rules and usages of the Catholic church which invested him with absolute control. If it be said that the purpose back of the action is irrelevant in a proceeding of this character, where the formal requirements have all

been met in the matter of the call for the meeting, and in the general conduct of the election, our reply is, that the application here is for equitable interference, not in a matter resting in contract, but in a matter having to do with the general policy of the law and express statutory regulation as well, and for so much the greater reason the familiar maxim applies, that equity will respond only as the suitor comes with clean hands. Need we argue the proposition that the suitor comes not with clean hands in such case when the unmistakable purpose of his coming is to accomplish something which the law forbids? Let us make this plain even though it be only to repeat, What the law does not expressly allow to such trustee, it forbids. The office of trustee simply of legal title is not created by ecclesiastical authority, but created by the law; such trustee can exercise no control whatever over the property held in trust; being an officer created by law, and answerable only to the law, he can derive neither authority nor power from any other source. His duties, privileges, authority and responsibility qua trustee, can neither be enlarged nor impaired by ecclesiastical interference, and any attempt to so interfere would be quite as illegal as though forbidden in express terms.

But suppose we are mistaken in attributing to the congregational meeting that elected Bishop Hoban a purpose to circumvent the law, it follows then that the election was made under a total misapprehension of the law regulating ownership of church property and the rights of the congregation therein. The fact of conflict between the rules and regulations of the Catholic church and the laws of the state in this regard, remains. It is idle to dispute such fact; it is too patent to be questioned, and further discussion of it would be but wasted effort. If in ignorance of its rights on the one hand, and the law's restriction on the other, the congregation by a majority of votes took the action on which these appellees base their claim, should the court lend its aid to compel compliance? Were contractual rights involved we might feel constrained to do

so; but we are embarrassed by no such consideration. No possible prejudice can come to any individual or interest by our withholding our sanction to the decree in this case. If St. Joseph's Lithuanian congregation desires Michael J. Hoban, whether described by his episcopal office or not, to be the custodian of the legal title to their church property, let them so declare by a majority vote of the adult male membership at a meeting regularly called, and their choice will not only be respected by the courts, but will by them be enforced if necessary. In either case no other purpose or understanding can be imputed than that the individual so chosen is to hold his office by virtue of the law, with no power of control whatever except what the law confers. However he may thereafter attempt interference with control of the property by the congregation, his action in this regard will be referred to his episcopal office and its legality adjudged accordingly, without regard to his trusteeship of the legal title.

It is urged that the decree from which the appeal is taken does not and cannot subject the church property to the control of the legal title. This is quite true; but the decree, except as it gives effect to the purpose of the congregation as expressed in the resolution which prevailed and which was the basis of its action, must be held extrajudicial, inasmuch as it substitutes for the will of the congregation in the matter of the selection of a trustee, the power of the court. The presumption may not be violent that the congregation would have elected Bishop Hoban trustee to hold under the law, but the court cannot presume that. That he was to hold it under the rules and regulations of the church, in view of what we have said, must be regarded as a condition of his election, which the court had no right to suppress or to ignore.

The eighth assignment of error was the refusal of the court to instruct in accordance with the ninth request for conclusions of law. The instruction asked for was as follows: "The action of the alleged meeting of June 8, 1908, embodied in the resolution claiming to have been adopted

by the meeting, and upon which plaintiffs based their right
to the relief prayed for in their appeal was illegal, and not
binding upon the congregation for the reason that its pur-
pose was to put the control and disposition of the property
of the congregation in the Bishop of the Diocese under
the laws of the Catholic Church, the same being in con-
flict with the laws of Pennsylvania." For the reasons
above stated we are of opinion that this point should have
been affirmed. We accordingly sustain the appeal. The
decree of the court requiring the defendants to execute,
acknowledge and deliver a proper deed of the premises
described in the plaintiff's bill held in trust by them for
St. Joseph's Lithuanian Catholic Congregation of the
city of Scranton to Rt. Rev. Michael J. Hoban, Bishop of
Scranton, as trustee for St. Joseph's Lithuanian Catholic
Congregation of the city of Scranton, is reversed, and it is
ordered that the appellees pay the costs of this proceeding.